**COLUMBUS–AMERICA DISCOVERY GROUP, INC., Plaintiff,**

v.

**The UNIDENTIFIED, WRECKED AND ABANDONED SAILING VESSEL, etc., Defendant.**

**Civil Action No. 2:87cv363.**

United States District Court, E.D. Virginia, Norfolk Division.

Signed July 14, 2014.

Philip N. Davey, Esquire, Bryan K. Meals, Esquire, Davey & Brogan PC, Norfolk, VA, for Plaintiff.

James L. Chapman VI, Esquire, Cyrus W. Grandy, Esquire, Steven M. Stancliff, Esquire, Crenshaw Ware & Martin PLC, Conrad M. Shumadine, Esquire, Brett A. Spain, Esquire, Willcox & Savage PC, Norfolk, VA, for Defendant.

### MEMORANDUM OPINION AND ORDER

REBECCA BEACH SMITH, Chief Judge.

This matter is before the court on the Motion to Substitute Party, filed by Recovery Limited Partnership ("RLP") on January 3, 2014. For the reasons stated herein, the Motion to Substitute Party is **GRANTED**.

### I. Factual and Procedural Background

In September of 1857, the *S.S. Central America* set off from Havana on her way to New York, carrying over 500 passengers and crew, as well as a significant amount of commercial and personal gold. *Columbus–Am. Discovery Grp. v. Atl. Mut. Ins. Co.*, 974 F.2d 450, 455–457 (4th Cir.1992) (detailing the circumstances leading up to the wreck, and the subsequent

salvage efforts). Two days into her voyage, the *Central America* encountered a strong hurricane, and ultimately sank off the coast of South Carolina, taking with her over 400 people and her valuable cargo. *Id.* As one of the worst maritime disasters in American history, the sinking received significant attention, but early attempts to locate the wreck were futile. *Id.*

Over 120 years later, Tommy Thompson and a number of investors formed RLP, with the objective of locating and salvaging the *Central America.* Mr. Thompson served as the general partner of RLP. *Id.* at 456; Mem. Supp. Mot. to Substitute, Ex. B at 2, ECF No. 2. In 1987, this group of investors created Columbus–America Discovery Group ("CADG"), with Mr. Thompson as its president, and entered into an agency agreement with CADG, whereby CADG would act as the agent of RLP in salvaging the *Central America.* Mem. Supp. Mot. Substitute Ex. A ("Agency Agreement"). The Agency Agreement provided that CADG "agrees to act exclusively as the Partnership's agent and for the benefit of the Partnership, incurring no benefit to itself, other than reimbursement of expenses." Agency Agreement ¶ 2.

After locating a wreck that it mistakenly believed to be the *Central America,* CADG filed this case to obtain salvage rights for any property recovered from the *Central America.* Complaint, May 27, 1987; *see Columbus–Am. Discovery Grp.,* 974 F.2d 450. It was not until two years later that CADG made a new find, which it verified was indeed the *Central America.* *Id.* At that point, the court put in place a permanent injunction, enjoining "any person having notice of this [injunction], actual or otherwise ... from conducting search, survey, or salvage operations, photographing or recovering any objects, entering, or causing to enter, anything on or below the surface of the Atlantic Ocean, or otherwise interfering with salvage operations being conducted by [CADG]." Order at 4, August 18, 1989; *see also* Order at 2, August 30, 1989.

Ultimately, the court awarded CADG exclusive salvage rights and a salvage award of ninety percent of the recovered gold, with the remaining value going to various underwriters of the vessel. *Columbus–Am. Discovery Grp. v. Atl. Mut. Ins. Co.,* 56 F.3d 556, 562 (4th Cir.1995). By the time the initial salvage operation was complete, CADG had salvaged gold and other artifacts with a present-day value of hundreds of millions of dollars. *Columbus–Am. Discovery Grp.,* 974 F.2d at 458. The case has been "closed" since July of 2000, and has not been reopened as an active case.

Despite these early successes, RLP and CADG have had many subsequent legal troubles. In 2006, a group of former crew members who had worked for CADG (the "*Williamson* plaintiffs") brought a lawsuit in the United States District Court for the Southern District of Ohio against several entities, including RLP and CADG, claiming they were not compensated as promised for their work in the salvage effort.[1] *See Williamson et al. v. Recovery Ltd. P'ship et al.,* No. 2:06cv292, 2011 WL 2181813 at *2 (S.D.Ohio June 3, 2011) *aff'd,* 731 F.3d 608 (6th Cir.2013) (detailing the facts leading up to that litigation). In that

---

1. Until this year, the only activities in the instant case since July of 2000 were motions in 2007 and 2011 to open sealed documents which were relevant to the ongoing litigation in the Southern District of Ohio. Motion to Permit Plaintiff Access to Sealed Inventory, September 7, 2007; Motion to Approve Modification of Protective Order, January 24, 2011; *see generally Williamson et al. v. Recovery Ltd. P'ship et al.,* No. 2:06cv292 (S.D.Ohio).

Ohio litigation, the *Williamson* plaintiffs sought a prejudgment attachment of assets, including commemorative gold restrike coins, which were owned by CADG's president, Mr. Thompson, and his related ventures. *Williamson,* 731 F.3d at 617. It was then discovered that some of those assets were missing. That court enjoined Mr. Thompson from selling the assets, and ordered him to explain what happened to them. When he failed to appear as ordered, the court issued a warrant for his arrest. *Id.* Mr. Thompson is currently a fugitive, and is actively sought by the United States Marshals Service.[2]

Moreover, RLP now finds itself placed in receivership by the Court of Common Pleas of Franklin County, Ohio. The court there found that RLP is in "great disarray and insolvency," and has placed RLP under the supervision of a receiver, Ira Kane, who is to "take and keep possession of any and all property" belonging to RLP, and "make every effort to ... conduct such maritime operations that are designed to make a positive financial return" for RLP. Mem. Supp. Mot. Substitute Ex. C at 2, ECF No. 2. It was presumably with that responsibility in mind that RLP, through its receiver, filed its Motion to Substitute Party, on January 3, 2014.[3]

On March 10, 2014, RLP filed a Supplemental Memorandum in Support of its Motion to Substitute Party ("Supplemental Memorandum"). ECF No. 20. Richard Robol, counsel for CADG, filed a response to that Supplemental Memorandum on March 17, 2014, ECF No. 21, in which he represented to the court that he believes that "RLP has not provided all facts that are material" to the Motion to Substitute Party. Resp. ¶ 3. On March 21, 2014, the court ordered Mr. Robol to file a memorandum to notify the court of any material facts relevant to the Motion to Substitute Party. Mr. Robol filed that Memorandum on April 9, 2014, ECF No. 25, and RLP filed its Response on April 16, 2014, ECF No. 28.

In addition to ordering that briefing, the court issued a Show Cause Order on April 1, 2014, ECF No. 23, ordering RLP to show cause why the Motion to Substitute Party should not be denied. The two issues raised by the court were: 1) whether RLP could be the real party in interest based on an agency agreement that appeared to have expired; and 2) whether CADG had exercised sufficient diligence to maintain its salvage rights, to which RLP now wanted to assume as the real party in interest. *See id.* RLP filed its Response

---

**2.** Although Mr. Thompson is clearly no longer able to be involved in the operations of CADG, counsel for CADG has represented to the court that an acting president, one Milton Butterworth Jr., has taken over the management of CADG.

**3.** Although the Motion to Substitute Party was initially unopposed, the *Williamson* plaintiffs, *see supra* note 1 and accompanying text, filed a Motion to Intervene in order to oppose the Motion to Substitute Party. They also filed a separate attachment action, seeking to attach CADG's salvage rights as security for any judgment they might receive in their case in the Southern District of Ohio. *See* Verified Complaint, *Williamson v. Columbus–Am. Discovery Group,* No. 2:14cv9 (Jan. 9, 2014).

The Court of Common Pleas of Franklin County, Ohio, subsequently ordered counsel for the *Williamson* plaintiffs to appear in court to show cause why they should not be held in contempt of court for interfering with the Receiver's court-ordered activities by filing the attachment. *See* Suppl. Mem. in Supp. of Mot. to Substitute Party at 4, ECF No. 20. Consequently, the *Williamson* plaintiffs withdrew their attachment action and Motion to Intervene in this case on February 7, 2014. Although their Motion to Intervene and Proposed Memorandum in Opposition have been withdrawn, many of their arguments are incorporated by reference in the filings by counsel for CADG, as discussed *infra* Part II.A.

to the Show Cause Order on April 18, 2014, ECF No. 32, and CADG filed a Reply on April 28, 2014, ECF No. 34.

In the meantime, although RLP found it necessary to move the court to substitute it as the real party in interest in this case, apparently it did not find it necessary to wait for an answer. RLP contracted with Odyssey Marine Exploration, Inc. ("Odyssey") to recommence salvage operations of the *Central America,* and on April 17, 2014, RLP filed a new *in rem* action with this court to obtain rights to the newly salvaged property that it had obtained from the salvage activity. *See* Verified Complaint, *Recovery Ltd. P'ship v. The Wrecked and Abandoned Vessel S.S. Central America,* No. 2:14cv160, 2014 WL 1496330 (E.D.Va. Apr. 17, 2014). The court issued a warrant for the arrest of the artifacts, which was executed by the United States Marshal for the Eastern District of Virginia. Rule D Warrant of Arrest, No. 2:14cv160, ECF No. 5.

In response to this new salvage activity, counsel for CADG filed Notices with the court in the case at bar on April 20, 2014, ECF No. 33, and April 28, 2014, ECF No. 35, notifying the court of the renewed salvage activities and alleging illegal activity in violation of the court's permanent injunction. RLP responded to these filings on April 30, 2014. ECF No. 36.

On May 7, 2014, the court held a hearing in which it heard argument on the Motion to Substitute Party, and set a schedule for further briefing. *See* Order, ECF No. 41, May 9, 2014. The court also found that Odyssey was qualified to continue the ongoing salvage operation, but made no finding as to whether the initiation of the salvage activity was a violation of the court's permanent injunction. *See id.* RLP filed a Second Supplemental Memorandum in Support of its Motion to Substitute Party on May 14, 2014, ECF No. 44,

to which CADG responded with a Response on May 25, 2014, ECF No. 59. RLP filed its Reply on May 28, 2014, ECF No. 61. The matter of whether RLP is the real party in interest in the case at bar is now ripe for review.

## II. Discussion

■■■■ "The underlying purpose of salvage law is the complete salvaging of a distressed vessel." *R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel,* 924 F.Supp. 714, 719 (E.D.Va.1996). Salvors do not receive title to the salvaged property. Rather, "they save it for the owners and become entitled to a reward from the owner or from his property," *R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel,* 286 F.3d 194, 202 (4th Cir.2002), and so a salvor is "bound to act for the interest of the owner as well as his own." *The Amethyst,* 1 F. Cas. 762, 764 (D.Me.1840). For that reason, a salvor has the right to exclude others from engaging in salvage operations only "so long as the original salvor appears ready, willing and able to complete the salvage project." *Treasure Salvors, Inc. v. Unidentified Wrecked & Abandoned Sailing Vessel,* 640 F.2d 560, 567 (5th Cir.1981).

■■■ In cases where the vessel has historic significance, the interests of the public are also to be considered. *See, e.g., Columbus–Am. Discovery Grp.,* 974 F.2d 450, 468 (4th Cir.1992); *MDM Salvage, Inc. v. Unidentified, Wrecked & Abandoned Sailing Vessel,* 631 F.Supp. 308, 310 (S.D.Fla.1986) ("[P]ublic interest is compelling in circumstances in which a treasure ship, constituting a window in time provides a unique opportunity to create a historical record of an earlier era,"). Moreover, the court is cognizant of the heightened level of respect that any salvor must afford to the site of the wreck of the *Central America,* as it is the final resting place of over 400 passengers and crew.

*Columbus–Am. Discovery Grp.*, 974 F.2d at 456. All of these considerations must be taken into account in any determination of salvage rights.

**■ A. The Real Party in Interest**

RLP's Motion to Substitute Party argues that it should be substituted as the real party in interest pursuant to Federal Rule of Civil Procedure 17(a)(1). That Rule states that "an action must be prosecuted in the name of the real party in interest." When a motion to substitute a plaintiff comes late in litigation, courts do not permit amendment "if the opposing party would suffer undue prejudice." *Intown Properties Mgmt., Inc. v. Wheaton Van Lines, Inc.*, 271 F.3d 164, 171 (4th Cir. 2001). In general, "[t]hose courts that have permitted late amendment under Rule 17 have not exposed defendants to additional liability without notice; they have ordinarily confronted requests to exchange a plaintiff or plaintiffs for another plaintiff or plaintiffs with identical claims." *Id.* Additionally, "the court may at any time, on just terms, add or drop a party." Fed.R.Civ.P. 21.

In the instant case, it was not improper for CADG to bring this action in its own name. Fed.R.Civ.P. 17(a)(1)(F) ("[A] party with whom or in whose name a contract has been made for another's benefit" may sue in its own name.). RLP, however, requests that it now be substituted as the plaintiff, and represents to the court that it is the real party in interest because CADG has always acted as RLP's agent. Mem. Supp. Mot. Substitute at 4.

RLP bases its argument on the Agency Agreement between RLP and CADG that went into effect on May 26, 1987. Mem. Supp. Mot. Substitute at 1; Agency Agreement at 1. It also cites the three orders entered by the Court of Common Pleas of Franklin County, Ohio, holding that under Ohio law, CADG acted exclusively as the agent of RLP, and that "RLP, as the principal, is the legal owner of the salvage and other rights in the *Central America.*" Mem. Supp. Mot. Substitute at 3, Exs. D, E, F.

**■** This court, not the Court of Common Pleas of Franklin County, Ohio, has jurisdiction to assign any salvage rights in the *S.S. Central America. Columbus–Am. Discovery Grp., Inc. v. Unidentified, Wrecked & Abandoned Sailing Vessel*, 742 F.Supp. 1327, 1333 (E.D.Va.1990) *rev'd on other grounds sub nom. Columbus–Am. Discovery Grp. v. Atl. Mut. Ins. Co.*, 974 F.2d 450 (4th Cir.1992). While it is true that the Agency Agreement makes clear that CADG acted as RLP's agent throughout the salvage operation and subsequent litigation, by its own terms the Agency Agreement appears to have terminated. Paragraph four of the agreement reads as follows:

> *Term.* The term of this Agreement shall commence as of the effective date hereof, and shall continue *until the earlier of: (a) ninety (90) days following the end of any calendar year in which the Partnership has not undertaken any substantial activity with respect to the location, verification, or recovery of the Central America;* (b) termination of the Partnership as provided in the Partnership Agreement; or (c) immediately upon written notice by the Partnership of termination of this Agreement.

Agency Agreement at 2 (emphasis added).

There is nothing in the record to suggest that there was any "substantial activity with respect to the location, verification, or recovery of the *Central America*" from 1991 until 2014; in fact, with regard to salvage operations, this case has been

closed for over a decade.[4] Consequently, the record reflects that the Agency Agreement, by its own terms, terminated years ago-ninety days after the last calendar year that substantial salvage activity was performed by CADG.

The parties do not contest that the Agency Agreement has ended; rather, they disagree as to the date of termination. CADG's Supplemental Mem. Opp. at 15, ECF No. 59; RLP's Second Supplemental Mem Supp. at 17, ECF No. 44. The termination of the principal/agent relationship, however, does not end the inquiry. The parties in this case agree on very few points; yet they appear to be in agreement that the Agency Agreement was in effect when CADG began salvage operations in the late 1980s and when the court declared it to be salvor-in-possession a few years later. CADG's Resp. to Second Supplemental Memo. at 2, 15; Mem. Supp. Mot. to Substitute at 1.

■ In analyzing this relationship, the court applies Ohio law; both RLP and CADG are Ohio entities, and the agreement specifically states that Ohio law will apply to the agreement. Agency Agreement ¶ 8(b). Under Ohio law, a principal is entitled to both tangible and intangible property gained by an agent as a result of their agency relationship. *See Aetna Ins. Co. v. Church*, 21 Ohio St. 492, 498 (1871); *see also Patterson v. Pollock*, 84 Ohio App. 489, 497, 84 N.E.2d 606 (1948) (holding that when an agent ended an agency relationship and continued negotiations on its own behalf, the principal was entitled to tangible and intangible property obtained as a result of the agency relationship);

Restatement (Third) Of Agency § 8.09 cmt. b (2006) ("A former agent who remains in possession of property of the principal holds it on the principal's behalf"). Under this rule, as the principal of CADG, RLP is entitled to the salvage rights obtained by CADG as a result of its agency relationship with RLP.

CADG has advanced several arguments to contest this clear principle of agency law. In its Response to the court's Order of March 21, 2014, CADG argues that it has a distinct "legal structure, ownership and management hierarchy" from that of RLP, and received revenues from other sources, suggesting that it has a corporate identity "other than as a mere agent for RLP." Mem. at 3–4; Supplemental Resp. at 22, ECF No. 59. Such assertions, even if true, do not disprove the fact that CADG was acting as RLP's agent *in pursuing this salvage action* of the *Central America*, and that the agency relationship makes RLP the real party in interest.

Next, CADG notes the commitment of CADG to the "long-term protection of the scientific, historical, and archaeological values of the shipwreck," and implies that RLP and Odyssey will not also have that commitment. *Id.* at 5–7, 11. At this juncture, this point is now moot. After extensive briefing and oral argument on the issue, the court determined that Odyssey, under its contract with RLP, is qualified to continue the 2014 salvage operation. Order, ECF No. 41, May 9, 2014.

CADG next argues that the Ohio state court proceedings in which RLP was de-

---

4. *See supra* note 1. *See also* Verified Complaint, *Recovery Ltd. P'ship v. The Wrecked and Abandoned Vessel S.S. Central America*, No. 2:14cv160, 2014 WL 1496330 (E.D.Va. Apr. 17, 2014); Resp. to Show. Cause Order, April 18, 2014, ECF No. 32 ("Active at-sea recovery operations were conducted during suitable weather windows from 1988–1991. The major recovery of gold treasure, considered to consist largely of the commercial shipment of specie, was recovered in 1989, with additional more limited recoveries in 1990 and 1991.").

termined to be the real party in interest were not adversarial. Mem. at 8. As a threshold matter, this court is not bound by the decisions of the Ohio state court that relate to determination of salvage rights of the *Central America,* so the sufficiency of those Ohio proceedings could not prejudice CADG in this matter. *See Columbus–America Discovery Group, Inc., et al. v. Unidentified & Abandoned Sailing Vessel,* 742 F.Supp. 1327, 1333 (E.D.Va. 1990) ("The Court has previously determined it had jurisdiction of the res and the subject matter of this suit.... Such determination has therefore become the law of the case.") *rev'd on other grounds sub nom. Columbus–Am. Discovery Grp. v. Atl. Mut. Ins. Co.,* 974 F.2d 450 (4th Cir. 1992).

CADG also raises several arguments that were initially brought by the *Williamson* plaintiffs in their proposed opposition brief, before they withdrew their Motion to Intervene in this matter.[5] First, CADG argues that RLP has consented to CADG being the named party in this case for twenty-six years, and is therefore subject to judicial estoppel in the matter. Mem. at 10. Although it does not cite case law to support this assertion, it references the *Williamson* plaintiffs' proposed opposition brief. In that filing, however, the case law used to support the use of judicial estoppel fails ·to support CADG's argument. The rule, as formulated in that filing, "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." Mem. Supp. Mot. to Intervene, Ex. A at 11, ECF No. 9. Importantly, the contradictory position must be "clearly inconsistent." *Id.* at 12. That proposed brief in opposition, and CADG's filing, do not allege that RLP ever stated that it was not the real party in interest, so there does not appear to be any inconsistency or contradictory statement that would give rise to the use of judicial estoppel.[6]

Moreover, CADG and RLP do not contest their former agency relationship, in which CADG was the agent of RLP. This agency relationship forms the basis of RLP's being the real party in interest. CADG does argue that because the agency relationship ended, RLP is really asking the court to set aside or correct the Order from 1989 which granted salvage rights to CADG. Reply to Resp. to Show Cause Order at 4 n. 2. CADG asserts that Federal Rule of Civil Procedure 60 governs such motions, and that RLP would be substan-

---

5. *See supra* note 3.

6. CADG also claims that the *Williamson* plaintiffs argued RLP cannot be named salvor-in-possession because it is insolvent. Mem. at 10. The *Williamson* Plaintiffs do not appear to have made this argument, and CADG offers no legal or logical support for why insolvency would relieve CADG of the agency duties discussed above. Additionally, CADG adopts the *Williamson* argument that RLP was dissolved in 2010. Mem. at 10; Mem. Supp. Mot. to Intervene Ex. A at 10. As a threshold issue, this argument is premised on a mistake of fact, as explained by RLP. Mot. to Strike at 2, ECF No. 84 ("In 1985 when Recovery Limited Partnership was formed, limited partnerships registered local-

ly in the county where they were located. Recovery Limited Partnership thus filed in Franklin County. To prevent a duplication of names, a fictitious name certificate was filed with the state. In 1995, the law was changed to provide for central filing. Central filing made the fictitious name certificate redundant. What was cancelled in 2010 was the fictitious name certificate."). Moreover, Ohio law specifically addresses what happens to partnership property in the event of dissolution, and it does not involve an agent assuming ownership of a principal's property, or any release from the agency duties discussed above. *See* Ohio Rev.Code § 1776.67 (2008) (dealing with partnership property in the winding up of a partnership).

tively and procedurally unsuccessful with such a motion. *Id.* Federal Rule of Civil Procedure 60 is inapplicable here. RLP is not asking for any change in the Order; CADG correctly received salvage rights in 1989. RLP is asking the court to acknowledge that it is the real party in interest with regard to those salvage rights, due to the uncontested agency relationship it had with CADG.

In sum, the principles of agency law applicable in this case dictate only one outcome: the court **FINDS** that RLP is the real party in interest by virtue of the Agency Agreement in place at the time CADG brought this action to obtain salvor-in-possession status of the *Central America,* under which award all salvage was conducted prior to 2014. CADG has made no argument that adequately supports another result.

### B. Diligence in Exercising Salvage Rights

■■■ Although the court finds that RLP is the real party in interest, this court still has to determine if there are any salvage rights to be had in this case. This question turns on whether RLP, or CADG as RLP's agent, has properly exercised those salvage rights.

■■■■■ This court has previously used the standard from *Martha's Vineyard Scuba Headquarters, Inc. v. Unidentified, Wrecked & Abandoned Steam Vessel,* 833 F.2d 1059, 1061 (1st Cir.1987), to determine if a salvor-in-possession has maintained its salvage rights. *R.M.S. Titanic, Inc.,* 924 F.Supp. at 722. The efforts of the salvor must be "(1) undertaken with due diligence, (2) ongoing, and (3) clothed with some prospect of success." *Id.*

"There is no set formula with which to measure the due diligence of a salvor"; rather, "the 'nature and situation' of the operations and the site itself will affect the requisite amount of control necessary to retain exclusive rights to the site." *Id.* at 720–22.

At first glance, there is nothing in the record to suggest that CADG was diligent in exercising its salvage rights after 1991.[7] In fact, RLP has represented to the court that CADG is a "defunct entity." Mem. Opp. Mot. Intervene at 12, January 28, 2014, ECF No. 13. Indeed, until RLP began renewed salvage activity in April of 2014, there was nothing in the record to suggest there had been any salvage activity for well over a decade.[8]

RLP, however, argues that it has met the standard.[9] First, RLP asserts that it has acted with due diligence with regard to the salvage. It points to the "extensive on-shore work associated with research, the development of new technologies, and the validation of historic provenance of the recovered artifacts, all of which constitutes 'salvage'...." Resp. to Show Cause Order at 13. Along with the time and effort required for the historical aspects of a salvage effort like the instant one, RLP points to the technological challenges, claiming that at the time of the original operation, "the ability to recover artifacts scattered throughout the remainder of the debris field had not then been invented," and that through improvements in hardware, software, and imaging technology, the state of the art has "finally evolved to the point of commercial viability today." Resp. to Show Cause Order at 14.

---

7. *See supra* note 4.

8. *See supra* note 4.

9. CADG does not contest this issue, presumably because opposing RLP's position would necessarily imply that CADG does not have salvage rights either.

Under the second factor of the test, RLP points to ongoing activities on-shore, including care and management of the previously salvaged material, ongoing scientific experiments with test materials placed at the wreck site, and activities related to determining commercial viability of further salvaging, as well as RLP's recent salvage operations it conducted in April of 2014. Resp. to Show Cause Order at 16. RLP also notes that the term "ongoing" also refers to present intentions, and its activities in this case and in the new salvage operation indicate that it has the intent to continue the salvage. *See R.M.S. Titanic,* 924 F.Supp. at 723.

Under the final factor of the test, RLP notes that it has a clear prospect of success, as evidenced by its current salvage operations, which have already resulted in the acquisition of additional artifacts. Resp. to Show Cause Order at 17–18. And as an additional argument, RLP points out that in cases where courts have found that a first salvor did not exercise due diligence, it was only after a second salvor brought an action to intervene and obtain salvage rights. Resp. to Show Cause Order at 11.

The record in this case shows that RLP has met the requirements of maintaining salvage rights. Despite a long period with no physical salvaging occurring at the wreck site, the ongoing on-shore activities, as well as the inherent delay of technological development to meet the challenges of a salvage operation like this one, support the conclusion that the salvage rights were maintained. Moreover, there has been no party—other than RLP—trying to gain salvage rights.[10] This observation might not be dispositive in itself, because without

attempted intervention by a second salvor, courts would be unlikely to consider whether salvage rights were lost. But the fact that no other party has tried to intervene in the salvage of the *Central America* corroborates RLP's assertion that it has acted as diligently as possible with the available technology over the years. Accordingly, the court **FINDS** that there has been diligent maintenance of the salvage rights to the wreck of the *Central America,* and that no other salvor has come forward. RLP is the real party in interest, and also it maintains salvor-in-possession status in this case.

## C. The New Salvage Operation

■ On April 17, 2014, RLP filed a new salvage action with this court as a result of its renewed salvage operations at the site of the *Central America,* conducted by Odyssey. *See* Verified Complaint, *Recovery Ltd. P'ship v. The Wrecked and Abandoned Vessel S.S. Central America,* No. 2:14cv160, 2014 WL 1496330 (E.D.Va. Apr. 17, 2014).

CADG filed Notices with the court on April 20, 2014, and April 28, 2014, stating that Odyssey's intrusion' into the area protected by this court's permanent injunction constitutes "knowing and willful violations" of this court's Orders, and that Odyssey "should be held in contempt of court, and all appropriate remedies awarded" in favor of CADG. Notice at 3, ECF No. 35.

In its Response to CADG's Notice, RLP argues that the new salvage operations were necessary for this court to maintain *in rem* jurisdiction over the wreck. Resp. to Notice at 2, April 30, 2014, ECF No. 36. According to RLP, this court's Show Cause Order of April 1, 2014, brought into

---

**10.** Although the *Williamson* plaintiffs filed an attachment action and a Motion to Intervene, it was not to gain the salvage rights for themselves; rather it was to attach those salvage rights as security for an anticipated judgment in their favor in a completely separate case. *See supra* note 1 and accompanying text.

question the loss of salvage rights, and than if the court ruled that salvage rights had not been maintained, it would no longer have jurisdiction over the wreck, making it impossible to enforce "the injunction against competing salvors in international waters," thereby leaving the wreck unprotected. *Id.* at 6. RLP alleges this was its motive when it dispatched Odyssey on its salvage mission. *Id.*

At first glance, this appears to be a legitimate concern. *See R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel,* 286 F.3d 194, 206 (4th Cir.2002) ("If and when RMST abandons its role as salvor or the court dispossess RMST of that role, the unsalvaged wreck will remain as any other unsalvaged wreck at the bottom of the sea, subject to salvage service by others."). This pretext, however, cannot be the genesis · of RLP's renewed salvage efforts; RLP clearly had plans to return to the wreck before the court's Show Cause Order was issued. A press release dated March 3, 2014, and submitted as an exhibit by CADG in its Memorandum in response to the court's Order of March 21, 2014, clearly indicates that Odyssey planned to begin salvage operations on behalf of RLP in "April 2014." Mem. Ex. 1, EOF No. 25. This press release was issued almost a month before the court's Show Cause Order.

RLP next argues that it is the true beneficiary of the injunction, and that in light of the injunction's purposes, RLP (and Odyssey, acting on RLP's behalf) should not be found to have violated it.[11] Resp. to Notice at 6. This argument, given

the court's ruling that RLP is the real part in interest, has merit.

 District courts are granted considerable deference when interpreting their own orders. *JTH Tax, Inc. v. H & R Block E. Tax Servs., Inc.,* 359 F.3d 699, 705 (4th Cir.2004) ("When a district court's decision is based on an interpretation of its own order, our review is even more deferential because district courts are in the best position to interpret their own orders."); *see Wolfe v. Clarke,* 718 F.3d 277, 284 (4th Cir.2013) *cert. denied,* ── U.S. ──, 134 S.Ct. 1281, 188 L.Ed.2d 299 (2014). "Whenever the extraordinary writ of injunction is granted, it. should be tailored to restrain no more than what is reasonably required to accomplish its ends." *Consolidation Coal Co. v. Disabled Miners of S.W.Va.,* 442 F.2d 1261, 1267 (4th Cir.1971) *cert. denied,* 404 U.S. 911, 92 S.Ct. 228, 30 L.Ed.2d 184 (1971); *Hayes v. N. State Law Enforcement Officers Ass'n,* 10 F.3d 207, 217 (4th Cir.1993). This standard supports the conclusion that RLP, as the real party in interest and the true beneficiary of the permanent injunction, should not be found in violation of it.

 Moreover, in order to establish civil contempt, a movant must show by clear and convincing evidence that it suffered harm as a result of the offensive conduct, among other elements. *JTH Tax,* 359 F.3d at 705; *Ashcraft v. Conoco, Inc.,* 218 F.3d 288, 301 (4th Cir.2000); *JTH Tax, Inc. v. Noor,* 2:11cv22, 2012 WL 4473252 at *2 (E.D.Va. Sept. 26, 2012). CADG cannot make such a showing on this record. As the court has made clear, the

---

**11.** Although CADG appears to be primarily attacking Odyssey's activities, under general principles of agency law, RLP would have a duty to reimburse Odyssey for any loss due to a finding of contempt. Restatement (Third) Of Agency § 8.14; *see, e.g., Admiral Oriental Line v. United States,* 86 F.2d 201, 202 (2d

Cir.1936) (holding that "an agent may recover any expenditures necessarily incurred in the transaction of his principal's affairs" where an agent who was sued for the loss of the steamship *Elkton* in a typhoon had the right to be reimbursed by the principal for the expenses of defending the lawsuit).

agency relationship ended, and any salvage rights that CADG gained as a result of that relationship were held on *behalf of RLP*.[12] "A former agent who remains in possession of property of the principal holds it on the principal's behalf," and is subject to the duty "not to use property of the principal for the agent's own purposes." Restatement (Third) Of Agency §§ 8.09 cmt. b, 8.05 (2006). Therefore, CADG could not have profited from the salvage rights. Even if the Agency Agreement were still in effect, it provides that CADG "agrees to act exclusively as the Partnership's agent and for the benefit of the Partnership, incurring no benefit to itself, other than reimbursement of expenses." Agency Agreement ¶ 2. Under the Agency Agreement, then, CADG would not see any profits from the continued salvage operations.[13] Consequently, there is no legal scenario in which CADG could have profited from continued salvage operations. Without lost profits as a result of RLP's new salvage operation, the elements of contempt are not met, and any remedy for a violation of the injunction would be a nullity.

While the court is troubled by the "salvage first, ask questions later" attitude demonstrated by RLP, the court concludes that RLP has always been the real party in interest in this case. Therefore, it would be improper to find RLP in violation of a permanent injunction that was put in place specifically to protect its own interests. Accordingly, because RLP is the real party in interest with regard to the salvage rights of the *Central America*, the

court declines to find RLP in violation of the permanent injunction.

### III. Conclusion

Recovery Limited Partnership's Motion to Substitute Party is **GRANTED,** and RLP is the salvor-in-possession of the wreck of the *S.S. Central America.*

The Clerk is **DIRECTED** to substitute RLP as the Plaintiff on the docket of this case. The Clerk is further **DIRECTED** to forward a copy of this Memorandum Opinion and Order to current counsel of record for RLP and CADG.

**IT IS SO ORDERED.**

---

12. *See supra* Part II.A.

13. Though a principal can, in certain circumstances, breach "the duty to refrain from unreasonable interference" with an agent's work, "[u]nless otherwise agreed, a principal is not subject to a general duty to refrain from competition with the agent that does not in-

terfere with the agent's ability to achieve standards set by contract." Restatement (Third) Of Agency § 8.13 cmt. b (2006). Obviously, there has been no unreasonable interference here, as CADG had ceased the salvage operation in 1991, which RLP has now resumed.